# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| JOSHUA GRANDERSON, | ) |  |
|---|---|---|
| Movant, | ) |  |
| v. | ) | No. 3:17-cv-00632 |
|  | ) | Judge Trauger |
| UNITED STATES OF AMERICA, | ) |  |
| Respondent. | ) |  |

## MEMORANDUM OPINION

Pending before the court is *pro se* movant Joshua Granderson's motion under 28 U.S.C. § 2255 (Doc. No. 1) to vacate, set aside, or correct a sentence previously imposed by this court. *See United States v. Granderson*, No. 3:13-cr-00036, Doc. No. 245 (M.D. Tenn. June 30, 2015) [hereinafter cited as "Crim. Doc. No. ___"].[1] The government filed a response. (Doc. No. 12.) For the following reasons, the movant's motion will be denied and this action will be dismissed.

**I.     Background**

In a previous criminal case in this court, an indictment charged the defendant with possession of a firearm as a felon and possession with intent to distribute drugs. *United States v. Granderson*, No. 3:12-cr-00045, Doc. No. 9 (M.D. Tenn. Mar. 1, 2012). The court granted the defendant's motion to suppress the relevant evidence in that case. (No. 3:12-cr-00045, Doc. No. 23.) On June 28, 2012, the court granted the government's motion to dismiss the indictment (No. 3:12-cr-00045, Doc. No. 40), bringing that action to a close.

---

[1] The movant completed his custody sentence and began a six-year term of supervised release on August 27, 2018. (*See* Crim. Doc. No. 277.)

On February 6, 2013, in the criminal case underlying this pending motion, an indictment charged the defendant with four counts of distributing crack and powder cocaine. (Crim. Doc. No. 17.) On direct appeal, the Sixth Circuit summarized the facts underlying these charges as follows:

> [Metropolitan Nashville Police Department] Detective Daniel Bowling had developed a woman known as "Jenny May"[2] as a confidential informant following an unrelated traffic stop. Jenny May had an ongoing relationship with Granderson, and Granderson had communicated with her while in custody during his first prosecution. Detective Bowling was unaware of the relationship between Jenny May and Granderson, and it had no impact on his investigation.
>
> In her role as an informant, Jenny May gave police a list of four or five individuals, including Granderson, from whom she said she could purchase drugs. Detective Bowling then investigated the background and criminal history of the individuals on the list. During his investigation, Bowling learned that Granderson had prior felony convictions and, based on social media photos, believed Granderson may have been involved in gang activities.
>
> With Jenny May's help, Bowling was able to buy drugs from Granderson on four occasions. Granderson sold Jenny May and Bowling crack cocaine on December 5 and December 11, 2012, and sold cocaine and crack cocaine to Bowling on December 18, 2012 and January 3, 2013. A federal grand jury indicted Granderson on four counts of possession and distribution of crack and powder cocaine.

*United States v. Granderson*, 651 F. App'x 373, 375 (6th Cir. 2016) (internal citations omitted).

Attorney James Mackler entered an appearance on behalf of the movant on March 4, 2013. (Crim. Doc. No. 26.) On March 15, 2013, the movant filed a motion to discover the identity of the confidential informant. (Crim. Doc. No. 34.) Five days later, the government filed an Information to Establish Prior Conviction Pursuant to 21 U.S.C. § 851 ("851 Enhancement"). (Crim. Doc. No. 39.) The court granted Mr. Mackler's motion to withdraw on April 19, 2013 (Crim. Doc. No. 45), and Kenneth Quillen and William Slone were appointed as substitute counsel (Crim. Doc. Nos. 46 and 56).

---

[2] "Jenny May" testified at trial under her real name, Jenifer Addington. Although the parties spell Ms. Addington's first name as "Jennifer" (Doc. No. 1 at 5; Doc. No. 12 at 1; Doc. No. 12-1 at 2), she spelled it as "Jenifer" at trial (Crim. Doc. No. 231 at 83).

The court began a jury trial on May 21, 2013. (Crim. Doc. No. 89–92.) The following morning, before the jury returned, the movant presented a letter to the court complaining that he did not have confidence in his attorney's handling of the case, specifically referencing chain of custody issues. (Crim. Doc. No. 65.) The movant orally expressed these concerns to the court as well. (Crim. Doc. No. 93 at 2–5.) The court declared a mistrial, the Federal Public Defender appointed Michael Terry to represent the movant, and the case was reset for trial. (*Id.* at 11, 14; Crim. Doc. Nos. 66 and 69.)

On January 29, 2014, the movant filed a Motion to Dismiss the indictment, arguing that he was the subject of vindictive prosecution, due to the successful exercise of his constitutional rights in his first criminal case. (Crim. Doc. No. 129.) He also filed a Motion to Strike the 851 Enhancement as, among other things, a vindictive expression of prosecutorial discretion. (Crim. Doc. No. 115 at 1 & n.3.) In a letter dated February 11, 2014, the movant requested yet another new counsel. (Crim. Doc. No. 143.) The court granted the movant's request (Crim. Doc. No. 145), and attorney John Oliva entered an appearance on behalf of the movant on March 5, 2014 (Crim. Doc. No. 147).

The movant, through Mr. Oliva, adopted the Motion to Dismiss and the Motion to Strike filed by previous counsel. (Crim. Doc. Nos. 152, 161.) In support of the vindictive-prosecution argument, the movant then filed two replies and numerous state court documents. (Crim. Doc. Nos. 160, 167, 174.) The court heard oral argument on the Motion to Dismiss and then set an evidentiary hearing, at which the government would be required to provide an on-the-record explanation regarding the decision to prosecute the movant. (Crim. Doc. No. 176 at 41–47; Crim. Doc. No. 177.) At the conclusion of the evidentiary hearing on October 17, 2014, the court denied the movant's motions. (Crim. Doc. No. 197; Crim. Doc. No. 205 at 150–55.) In a *pro se* letter

postmarked October 24, 2014, the movant asserted that the court abused its discretion in denying the Motion to Dismiss. (Crim. Doc. No. 202.)

The court held another jury trial (Crim. Doc. Nos. 228–32), and the jury convicted the movant on all four counts on November 14, 2014 (Crim. Doc. No. 214). The movant filed a timely Renewed Motion for Judgment of Acquittal. (Crim. Doc. No. 219.) In a *pro se* letter dated December 16, 2014, the movant again requested new counsel. (Crim. Doc. No. 222.) On January 27, 2015, the court denied the Renewed Motion for Judgment of Acquittal (Crim. Doc. No. 233) and relieved Oliva as counsel for the movant (Crim. Doc. No. 234). On January 30, 2015, James Simmons entered an appearance on his behalf. (Crim. Doc. No. 235.)

On February 5, 2015, the court received the movant's *pro se* motion to reconsider the denial of his Motion to Dismiss. (Crim. Doc. No. 238.) The court denied the motion and advised the movant that he must work through his new counsel to file motions. (Crim. Doc. No. 239.) On June 29, 2015, the court sentenced the movant to a total term of 72 months' imprisonment, to be followed by 6 years of supervised release. (Crim. Doc. No. 245 at 2–3.) The Sixth Circuit affirmed the court's judgment. (Crim. Doc. No. 268); *Granderson*, 651 F. App'x at 375. The movant later filed this timely *pro se* motion under 28 U.S.C. § 2255 (Doc. No. 1), and the government filed a response, accompanied by an affidavit from trial counsel John Oliva (Doc. Nos. 12 and 12-1).

## II. Analysis

The movant asserts that Oliva was ineffective in four ways: (1) refusing to file a motion to reconsider the court's denial of the Motion to Dismiss; (2) failing to introduce a recording during the testimony of Jenifer Addington; (3) failing to prepare the movant to testify before trial; and (4) failing to object to the chain of custody of drug evidence. (Doc. No. 1 at 4–10.)

To prevail on a claim for ineffective assistance of counsel, the movant bears the burden of showing, first, "that his counsel provided deficient performance," and second, that "the deficient performance prejudiced [his] defense." *Sylvester v. United States*, 868 F.3d 503, 509–10 (6th Cir. 2017) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Trial counsel's performance is deficient where it falls "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [movant] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

To establish prejudice, the movant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "In making this showing, '[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Sylvester*, 868 F.3d at 511 (quoting *Strickland*, 466 U.S. at 693). Instead, the movant "must show that 'counsel's errors were so serious as to deprive the [movant] of a fair trial, a trial whose result is reliable.'" *Id.* (quoting *Strickland*, 466 U.S. at 687). "[A] court deciding an ineffective assistance claim" need not "address both components of the inquiry if the [movant] makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

**A.    Motion to Reconsider**

James Mackler represented the movant from March 4, 2013 to April 19, 2013. (Crim. Doc. Nos. 26 and 45.) On March 15, Mackler filed a motion to discover the identity of the confidential informant. In a letter to the movant dated March 19, Mackler addressed various legal issues and

5

investigative matters. (Crim. Doc. No. 238-1.) One day later, Assistant United States Attorney ("AUSA") Clay Lee filed an 851 Enhancement. Through later counsel, the movant filed a Motion to Dismiss for vindictive prosecution and a Motion to Strike the 851 Enhancement, in part, because it was vindictive. The court denied these motions after an evidentiary hearing on October 17, 2014.

The movant asserts that, after the October 2014 evidentiary hearing, he showed Mackler's March 2013 letter to then-counsel John Oliva, and the letter contradicted AUSA Lee's evidentiary hearing testimony on plea negotiations. According to the movant, Oliva was ineffective for failing to file a motion to reconsider the denial of the Motion to Dismiss based on this letter.

As an initial matter, Oliva does not concede that the movant actually showed him Mackler's letter. In his affidavit, Oliva states that he does "not recall a specific discussion" with the movant about filing a motion to reconsider based on Mackler's letter. (Doc. No. 12-1 at 1.) And, as demonstrated below, the movant's *pro se* filings in the criminal case are consistent with the proposition that he did not show Mackler's letter to Oliva.

In a *pro se* letter postmarked October 24, 2014—one week after the court denied the Motion to Dismiss—the movant argued that the court abused its discretion during the evidentiary hearing. He noted a purported contradiction between AUSA Lee's hearing testimony and the government's response to the Motion to Dismiss. (Crim. Doc. No. 202 at 1.) He also raised complaints regarding Oliva's performance at the evidentiary hearing. (*Id.* at 2.) But, notably, he makes no reference to Mackler's letter. Likewise, in a *pro se* letter dated December 16, 2014, the movant presents a litany of complaints regarding Oliva's performance throughout the course of his representation. (Crim. Doc. No. 222.) Entirely absent from these complaints, however, is any mention of Mackler's letter. Finally, in the *pro se* motion to reconsider postmarked January 26, 2015 (Crim. Doc. No. 238-2)— about six weeks after he requested Oliva's removal as counsel—the movant referenced Mackler's

6

letter for the first time. (Crim. Doc. No. 238 at 2.) There, as here, the movant argued that the letter is inconsistent with AUSA Lee's hearing testimony. (*Id.*) Yet, the movant did not assert that he showed Mackler's letter to Oliva, that he told Oliva to file a motion to reconsider based on the letter, or that Oliva refused to file a motion to reconsider.

In sum, the court cannot find a factual basis for the movant's claim in the criminal case record, the movant's pending motion, or Oliva's affidavit. Thus, the movant's assertion that he showed Mackler's letter to Oliva is a conclusory assertion, and the court need not hold an evidentiary hearing to find that it is not credible. *See Thomas v. United States*, 849 F.3d 669, 681 (6th Cir. 2017) (citing *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001)) ("Bald assertions and conclusory allegations do not provide sufficient ground . . . to require an evidentiary hearing."); *Fifer v. United States*, 660 F. App'x 358, 363 (6th Cir. 2016) (quoting *Valentine v. United States*, 488 F.3d 325, 333 (6th Cir. 2007)) ("An evidentiary hearing is not required when a petitioner's claims 'cannot be accepted as true because they are contradicted by the record, [are] inherently incredible, or are conclusions rather than statements of fact.'"). The court concludes that Oliva did not perform deficiently by failing to file a motion to reconsider based on a letter he did not know existed.

Even assuming that the movant showed Mackler's letter to Oliva, however, his claim still fails. The movant attached Mackler's letter to his *pro se* motion to reconsider. It is addressed to the movant and dated March 19, 2013. In relevant part, the letter states: "If you are interested in a plea agreement, I could probably get the US Attorney's office to drop the school zone. Please let me know your thoughts about a plea and also about any other leads you would like me or Ron to follow-up." (Crim. Doc. No. 238-1 at 2.) At the evidentiary hearing, AUSA Lee testified that he filed the 851 Enhancement on March 20, 2013, "as a response in my mind that Mr. Granderson

7

was heading to trial, and it crystalized over the course of degradation of negotiations with Mr. Mackler, a number of phone conversations, and then by the time the actual motion was filed, plea negotiations had degraded to the extent that I was confident it was headed to trial." (Crim. Doc. No. 215 at 143–44.)

While Mackler's letter may be read to imply his belief that the parties could reach a plea agreement as of March 19, the letter does not shed light on AUSA Lee's subjective impression of the case at the time. That is, AUSA Lee's testimony reflected his personal belief that the case was likely going to trial, and Mackler's letter does not establish that this stated belief was pretext for a vindictive motive. Thus, the letter would not have provided a basis to reconsider denying the Motion to Dismiss, and Oliva did not perform deficiently in failing to pursue a course of action that was unlikely to be successful. *Sylvester*, 868 F.3d at 510 (quoting *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002)) ("[O]nly when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome."). Further, because there is not a reasonable probability that a motion to reconsider based on Mackler's letter would have been successful, the movant has also failed to demonstrate prejudice.

Moreover, AUSA Lee's stated rationale for filing the 851 Enhancement is supported by the record. When he filed the enhancement, trial was scheduled to start about two months later, on May 21, 2013 (Crim. Doc. No. 31), and the movant did, in fact, proceed to trial on that date. As the court found at the conclusion of the evidentiary hearing, AUSA Lee followed the government's "normal procedure" of filing an enhancement when he believed the case would proceed to trial. (Crim. Doc. No. 205 at 154.) This procedure, the Sixth Circuit has held, is not legally improper. *See United States v. Crayton*, 357 F.3d 560, 572 (6th Cir. 2004) (discussing *United States v. LaBonte*, 520 U.S. 751 (1997)) ("The discretion a prosecutor exercises in determining whether an

8

enhanced statutory maximum applies under § 851 is similar to the initial discretion the prosecutor has in deciding which charges to bring against a defendant, discretion that is obviously constitutional.").

### B. Recorded Telephone Call

Next, the movant asserts that the contents of a telephone conversation between Jenifer Addington and the movant were important to proving his entrapment defense, and so Oliva was ineffective in failing to introduce a recording of this call during Ms. Addington's testimony.

The government's first witness during trial was Daniel Bowling, the Metro Nashville Police Department detective who developed Addington as a confidential informant and subsequently conducted the four controlled drug buys that led to the movant's convictions in this case. (Crim. Doc. No. 230 at 24.) On cross-examination, Oliva informed the court during a bench conference that he intended to question Detective Bowling regarding the recording at issue in the movant's second claim. (*Id.* at 131–32.) As to the recording itself, Bowling and Addington were present in the same location, and the recording captures Bowling's introductory statement and Addington's side of a telephone conversation with the movant. (*Id.* at 132–33.) The government raised a hearsay objection, and the court ruled that the movant could not introduce the recording through Bowling. (*Id.* at 132, 134.)

Before the jury entered the next morning, Oliva again raised the issue of this recording. (Crim. Doc. No. 231 at 11.) He stated that he had a transcript prepared of the recording but could not review the transcript with Addington because he had not located her. (*Id.* at 11–12.) The government argued that the recording could be introduced only if Addington testified and the movant used it to impeach her prior inconsistent testimony. (*Id.* at 12.) The court stated that, if the

movant called Addington as a witness, Oliva could treat her as hostile[3] and use the recording to impeach any testimony inconsistent with the recording. (*Id.* at 13.)

After the government rested its case-in-chief, the movant called Addington as a witness. (*Id.* at 82.) Addington testified that she previously dated and engaged in a sexual relationship with the movant. (*Id.* at 84.) She testified that the movant spent "several nights" at her apartment and kept some belongings there but they did not officially live together (*id.* at 98), and the relationship ended on good terms (*id.* at 84, 97, 113). In mid-2012, after the relationship ended, Addington was in a car pulled over by the police, and Detective Bowling offered her a choice—either be charged as a result of the stop or "work [her] charge off" by becoming a confidential informant. (*Id.* at 84–85, 87.) She agreed to set up a controlled drug buy with the movant and started placing phone calls to him in November 2012 to do so. (*Id.* at 85–86.) Addington testified that the movant did not have any drugs at the time. (*Id.* at 87.) She also testified that she called the movant on December 5, 2012, to set up the first buy later that day but that she did not remember the exact details of the conversation. (*Id.* at 87–88.) The court permitted Oliva to provide Addington a transcript of this call—the same call at issue here—to refresh her recollection of the conversation. (*Id.* at 88.)

After reviewing the transcript, Addington testified that she placed this call to the movant and told him she was staying with her brother and this was hard for her because she had to live by her brother's restrictive rules. (*Id.* at 89–91.) She told the movant she needed money. (*Id.* at 91.) During this conversation, Addington told the movant that she wanted to buy drugs from him, even if the person he had to get the drugs from was going to overcharge. (*Id.* at 94–95.) She testified that she wanted the deal to go forward because she would do whatever was necessary to avoid the

---

[3] "[A] defendant can . . . employ leading questions in questioning a hostile witness on direct examination just as he could in cross-examination." *Peak v. Webb*, 673 F.3d 465, 474 (6th Cir. 2012) (citing Fed. R. Evid. 611(c) and *United States v. Hughes*, 308 F. App'x 882, 890 (6th Cir. 2009)).

charges that could have resulted from Bowling's traffic stop. (*Id.* at 95.) She also testified that the movant did exactly what she asked by bringing the drugs to the controlled buy later that day. (*Id.* at 92.)

Here, Oliva's handling of the recorded call between Addington and the movant was not deficient. As stated above, Oliva used a transcript of the recording to refresh Addington's recollection of the conversation and then elicited testimony consistent with the transcript. The movant does not explain what would have been accomplished by playing the recording itself that was not already accomplished by introducing select contents of the call through Addington's testimony. Addington's testimony regarding the conversation—that she called the movant, that the movant did not have drugs at the time, and that she wanted to buy drugs from the movant even though the person the movant had to get drugs from would likely overcharge—was not inconsistent with the movant's entrapment defense. Thus, in Oliva's judgment, playing the recording itself may have harmed the movant by providing Addington an "opportunity to offer adverse explanations concerning her conduct to the detriment of" the entrapment defense. (Doc. No. 12-1 at 3.)

The movant has not overcome the presumption that Oliva's handling of the recording and Addington's testimony "might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (quoting *Michel*, 350 U.S. at 101); *id.* at 691 ("[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."). Nor has the movant demonstrated a reasonable probability that the outcome of the trial would have been different if the jury had heard the recording itself, rather than Addington's testimony about the conversation. The movant therefore fails to establish both deficiency and prejudice on this claim.

### C. The Movant's Trial Testimony

The movant also asserts that, before trial, Oliva did not tell him that he would need to testify to establish an entrapment defense.

As above, the court first notes that the criminal case record does not provide contemporaneous corroboration to support the movant's claim. In his *pro se* letter submitted about one month after trial, the movant listed numerous complaints regarding Oliva's representation and requested that the court relieve Oliva as counsel. There, the movant stated that he informed Oliva that he "did not want to testify unless [he] had to." (Crim. Doc. No. 222 at 1.) But the movant did not state that Oliva failed to prepare him to do so—an assertion that would have been relevant to his request to obtain substitute counsel at the time.

Moreover, the movant's bare assertion that Oliva did not prepare him to testify is contradicted by specific facts in Oliva's affidavit. In his affidavit, Oliva swears that he had "numerous discussions" with the movant before trial about the need for the movant to testify to assert an entrapment defense. (Doc. No. 12-1 at 4.) Oliva specifically attests that he "spent a substantial time reviewing the expected direct examination and likely cross-examination" during his final two pretrial meetings with the movant. (*Id.*) "During the last meeting in the U.S. Marshal's lock up (in the days before trial started)," Oliva attests, "second chair Carrie Searcy and I reviewed the trial procedure, Mr. Granderson's expected testimony, and demeanor in the court room. Preparation included reviewing the questions I would ask on direct examination and anticipated answers; and the anticipated questions (both general areas and specific questions) and expected answer for cross examination." (*Id.*)

Because the movant does not offer any facts to support his claim, the court credits Oliva's detailed testimony that he prepared the movant to testify before trial over the movant's conclusory

assertion that he did not. The court need not hold an evidentiary hearing to do so. *See Amr v. United States*, 280 F. App'x 480, 485 (6th Cir. 2008) (footnote omitted) (holding that a district court correctly denied an evidentiary hearing on a claim under Section 2255 where the record consisted of the government's brief and a declaration from the movant's former counsel that contradicted the movant's claim, and the movant had "not identified any evidence, other than his own testimony, that he could present to support his claim"); *Akins v. United States*, No. 1:08-cv-203, 2011 WL 122037, at *7 (E.D. Tenn. Jan. 14, 2011) ("A factually unsupported claim of failure to prepare a defendant . . . to testify is insufficient to state a constitutional violation.").

Further, the movant relied on the entrapment defense throughout trial and acknowledges his belief that the jury would have found him guilty if he was unable to establish it. (Doc. No. 1 at 7.) Entrapment is an affirmative defense that requires a defendant to demonstrate "two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct." *Mathews v. United States*, 485 U.S. 58, 62–63 (1988) (citations omitted). According to Oliva's affidavit, he spoke with the movant during a recess at trial and explained[4] that, given the "evidence adduced to that point in trial," the movant's testimony would be necessary to establish the entrapment defense. (Doc. No. 12-1 at 4.) And Oliva's advice proved accurate—after the government rested its case-in-chief, and despite Oliva's argument to the contrary, the court ruled that the movant had not established an entrapment defense because there was insufficient evidence introduced during the government's proof that he lacked a predisposition to engage in the charged crimes. (Crim. Doc. No. 231 at 78–80.)

---

[4] On the second day of trial, just before the government played a recording of a jail call the movant purportedly made while detained prior to trial, Oliva informed the court at a bench conference that the movant wanted to leave the courtroom and not attend the rest of the trial. (Crim. Doc. No. 231 at 57–58.) The court denied the request (*id.* at 58), and later took a morning recess (*id.* at 62). Only after Oliva's ensuing explanation regarding the entrapment defense, he attests, did the movant agree to return to the courtroom following the recess. (Doc. No. 12-1 at 4–5.)

13

The movant testified later that day (*id.* at 118), and the court subsequently ruled that it would instruct the jury on the defense of entrapment (*id.* at 193–94). It is therefore clear that, just as Oliva advised the movant before and during trial, the movant's testimony was key to carrying his burden of establishing an entrapment defense. Although the jury's guilty verdict reflects that this defense was ultimately unsuccessful for the movant, Oliva did not perform deficiently in executing the agreed-upon strategy of relying on an entrapment defense. *See Strickland*, 466 U.S. at 691 ("Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant."). Additionally, the movant has not explained how he would have established the entrapment defense without his testimony, nor has he identified a different defense strategy with a reasonable probability of resulting in a different outcome. The movant, accordingly, fails to demonstrate prejudice as well.

### D. Chain of Custody

Finally, the movant asserts that Oliva was ineffective in failing to object to the chain of custody of drug evidence. The movant also contends as part of this claim that Detective Bowling "perjured himself in his testimony at trial." (Doc. No. 1 at 8.)

The movant's blanket assertion that Oliva "failed to object to the drug evidence for a break in the chain of custody" is contrary to the record. In fact, Oliva did so at least two times. First, Bowling testified on direct examination by the government regarding an evidence bag containing drugs obtained from the movant during the first controlled buy, as well as photographs of the proposed exhibit. (Crim. Doc. No. 230 at 53–56.) The government moved to admit the photographs. (*Id.* at 56.) Oliva objected, arguing that the government had not established "the full chain of custody." (*Id.*) The court essentially sustained Oliva's objection, refusing to admit the evidence bag or the photographs at that time. (*Id.* at 56–57.)

14

Second, after Bowling gave additional testimony that the evidence bag had been properly sealed and there was no evidence of tampering, the government again moved to admit the evidence bag and associated photographs. (*Id.* at 57–59.) Oliva objected, arguing that the government still had not established "the full chain of custody" of the evidence bag and that the photographs were "not a fair and accurate depiction of the evidence bag." (*Id.* at 59–60.) The court sustained Oliva's objection, ruling that the government had not yet established the evidence bag's chain of custody. (*Id.* at 60.) The court also ruled that, to be admitted, any photographs would have to show the entire evidence bag. (*Id.* at 60–61.) Bowling later testified that the evidence bags containing drugs from the other three controlled buys were properly sealed and there was no evidence of tampering, but the government did not move to admit them at that time. (*Id.* at 79–80, 86–87, 91–92.)

Because Oliva lodged two successful chain-of-custody objections during Bowling's testimony, the movant's claim has no basis in fact. To be sure, the government introduced the evidence bags the next day through Denotria Patterson, a scientist with the Tennessee Bureau of Investigation (Crim. Doc. No. 231 at 40), and Oliva did not object to their introduction through Patterson. (*Id.*) But their introduction occurred only after Patterson testified that the evidence bags were properly sealed, both before and after she tested their contents. (*Id.* at 27, 31, 34, 36–37, 39–40.) Particularly when viewed in the context of his previous successful objections, Oliva was not deficient in failing to object to the introduction of the evidence bags at this stage.

As the court stated before the jury entered on the second morning of trial, physical evidence is admissible "as long as there is a reasonable probability that the evidence has not been altered or misidentified, . . . and whatever the defense wants to make of any possibilities of alteration or misidentification go to the weight of the evidence, not its admissibility." (*Id.* at 15); *see United States v. Allen*, 619 F.3d 518, 525 (6th Cir. 2010) (internal quotations and citations omitted)

("Chain of custody issues are jury questions and the possibility of a break in the chain of custody of evidence goes to the weight of the evidence, not its admissibility. Physical evidence is admissible when the possibilities of misidentification or alteration are eliminated, not absolutely, but as a matter of reasonable probability. Merely raising the possibility of tampering is insufficient to render evidence inadmissible. Where there is no evidence indicating that tampering with the exhibits occurred, courts presume public officers have discharged their duties properly.").

The movant has not explained how raising additional objections would have provided actual evidence that any law enforcement officers tampered with the evidence bags or that Bowling perjured himself. Accordingly, even if Oliva objected to the admission of the evidence bags during Patterson's testimony, there is not a reasonable probability that the court would have excluded the evidence or that the trial result would have been different. This claim is without merit.

## III. Conclusion

For these reasons, the movant is not entitled to an evidentiary hearing, and his claims for ineffective assistance of counsel fail. Accordingly, the movant's motion under 28 U.S.C. § 2255 (Doc. No. 1) will be denied and this action will be dismissed.

Rule 11(a) of the Rules Governing Section 2255 Cases requires that a district court "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A certificate of appealability may issue only if the "applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack*

16

*v. McDaniel*, 529 U.S. 473, 484 (2000)). The court finds that the movant has not satisfied this standard and will therefore deny a certificate of appealability.

An appropriate order is filed herewith.

ENTER this 9th day of May 2019.

_____
ALETA A. TRAUGER
United States District Judge